# Mary J. Thompson's Appeal.

## Charles C. Rhodes' Estate.

On the presentation by a note broker of a claim against a decedent's estate for services rendered the decedent, where the evidence shows that the general custom among note brokers is to claim and receive their compensation at the completion of each transaction, a presumption arises that payment was made in accordance with such custom.

This presumption of payment is strengthened by the fact that no demand was made during the lifetime of the decedent, although he lived for more than a year after the alleged services had been completed.    . .ı

Evidence in reference to a claim of a note broker against a decedent's estate, for compensation for alleged services rendered the decedent in raising money upon his notes and upon certain railroad bonds, and in the course of a suit connected with the foreclosure of a railroad mortgage,— *Held*, insufficient to show services justifying the claim presented, or to relieve it from the bar of the statute of limitations or from the presumption of payment arising from the course of business among note brokers.

Proof of a new promise, relied upon to remove the bar of the statute of limitations, must be clear and explicit.

A claim by a layman for so large a sum as $3,400 for services in a law suit is of such an extraordinary character that it should be supported by evidence clearly showing what the services were.

When the right to demand an account from an administrator depends upon the fact of the demandant's being a creditor, costs cannot be allowed such demandant when his claim as a creditor is not sustained.

Where a claimant had failed to assert his claim against a decedent's estate for over a year after the decedent's death,—*Held*, that the distribution among the decedent's next of kin of the balance of the estate shown by the administration account should not, under the circumstances of the case, be suspended to await the introduction of additional testimony by claimant or pending the determination of a threatened litigation by a claimant for the settlement of a partnership alleged to have existed between him and the decedent.

(Argued April 3, 1888.   Decided May 7, 1888.)

January Term, 1888, No. 225, E. D., before GORDON, Ch. J.,. PAXSON, STERRETT, GREEN, CLARK, and WILLIAMS, JJ. Certiorari sur appeal by Mary J. Thompson, assignee of Holmes B. Kelley, to review a decree of the Orphans' Court of Philadelphia County dismissing exceptions to an adjudication upon an account of Charles C. Rhodes et al., administrators of Charles. C. Rhodes, deceased, April term, 1885, No. 202. Affirmed.

The facts appear from the following adjudication opinion of the auditing judge, PENROSE, J.:

The decedent died, as represented in the petition annexed,. April 19, 1884, intestate, a widower, leaving five children, Charles C. Rhodes, William Rhodes, Ralph B. Rhodes, Courtland Rhodes, and Frank H. Rhodes. Claims were presented by Susan Turner, S. P. Kase, Dr. S. K. Ashton, Holmes B. Kelley.

The claim of Holmes B. Kelley, which has been assigned to Mary J. Thompson, was for the sum of $13,500 for services rendered the decedent between the years 1875 and 1883, inclusive.. Of this sum it was alleged that $10,000 were for services in raising money upon the notes of the decedent, negotiating the bonds of the Danville, Hazleton, & Wilkesbarre Railroad Company, and raising money for him on the mortgage bonds of the new road, the Sunbury, Hazleton, & Wilkesbarre Railroad Company; that the agreement of the decedent, as originally made, was that he would pay for the services so rendered when the litigation with regard to the railroad was ended; and that the time of payment was subsequently extended until the termination of his contest with Simon P. Kase. The remaining $3,500 were for special services alleged to have been rendered in a. proceeding in equity, common pleas No. 4, June term, 1878,. No. 339, between Alexander F. Porter, plaintiff, and William Kinsey and others, defendants, growing out of the transactions, with regard to the Danville, Hazleton, & Wilkesbarre Railroad Company.

There was no evidence whatever that a contract, such as alleged, was ever entered into by the decedent. The claimant was. a note broker, and in that capacity appears to have acted for the decedent at various times, the number of which and the amounts involved were not shown. So far as the services were rendered more than six years before the decedent's death, the claim is. barred by the statute of limitations, but no statement was pre-

sented by which it could be determined what part of the claim was thus barred, and what was not.

Moreover, the evidence showed that the general custom among note brokers is to claim and receive their compensation at the completion of each transaction. A presumption, therefore, arises that payment was made in accordance with this custom—a presumption which is strengthened by the fact that no demand was made, so far as the evidence shows, during the lifetime of the decedent, although he lived for more than a year after the alleged services had been completed. McConnell's Appeal, 97 Pa. 31.

Nor was there any evidence to show that the decedent ever promised to pay for services rendered by the claimant in the suit of Porter v. Kinsey. The plaintiff in that case was the holder of first mortgage bonds of the Danville, Hazleton, & Wilkesbarre Railroad Company, to the amount of $72,000; but, though notified so to do, he had failed to avail himself of the benefit of the agreement between the bondholders and the committee with regard to the foreclosure of the mortgage and the formation of the new company. The bill was for an account of the profits arising from the foreclosure of, etc. The defendants, by their answer, denied the existence of any trust in favor of the plaintiff, and his right to participate in such profits. The case was referred to an examiner, and subsequently to a master, who reported that the plaintiff had failed to establish a trust, and recommended that his bill should be dismissed, and, after argument upon exceptions to the master's report, it was dismissed accordingly, in 1880.

. The decedent was not a party to this proceeding upon the record, but, under his arrangement with the committee of the bondholders, the defense was conducted by him. The claimant was a witness, and appears to have had interviews with the decedent at various times with regard to the case. There was no attempt, however, to point out specific services rendered by him in the matter, although the attention of his counsel was directly called by the auditing judge to the importance of so doing; nor was there any evidence of the value of the alleged services, as a whole, except as heretofore stated, or that the services were different from those rendered by any other witness, and compensated by his fees as such. The only thing at all resembling a statement of either branch of the claim consisted

of extracts from the personal diary of the decedent, copies of which were submitted to the auditing judge. As to these extracts it need only be said that they fail to show services justifying to the remotest extent the claim as presented, or to relieve the case of the bar of the statute of limitations, or from the presumption of payment arising from the course of business among note brokers.

It was contended, however, by Mr. Harrington that the claim was established by the testimony of Dr. S. H. Ashton and of Mrs. Maria Patton, the testimony of the latter being relied upon as proving the debt for $10,000, and of the former the claim for services in the matter of the suit of Porter v. Kinsey.

Mrs. Patton testified that she made loans, amounting in all to about $5,000, to the decedent, Mr. Rhodes, through the claimant, during the years 1876 to 1878 or 1879. That in 1879 or 1880, on one occasion, when she and Mr. Kelley were in Mr. Rhodes' office, Mr. Rhodes had said to her "that Mr. Kelley had rendered him very valuable services." "Mr. Rhodes," said the witness, "knew that Mr. Kelley was indebted to me," and he said: "Mrs. Patton, I intend to pay Mr. Kelley, give him money, and make him a free man; and yours shall be the very first that shall be paid, because it is a debt of honor, as well as a debt of gratitude." Further testimony of the witness on this subject was as follows:

By plaintiff's counsel:

*Q.* Did he have anything there by which he indicated the amount of Mr. Kelley's indebtedness at that time?

*A.* No, sir; he said that Mr. Kelly had considerable judgments, but he did not state the amount to me at that time.

*Q.* Do you know whether he had a list of judgments there at that time?

*A.* I really cannot say, but I think he had. No list was produced or exhibited.

*Q.* Did he say what those services of Mr. Kelley were?

*A.* Yes, sir; he said that he had worked for him in this railroad matter.

*Q.* Did he say to you at that time when Mr. Kelley was to be paid?

*A.* When the Kase Case was through, and he said that then

he would settle with Mr. Kelley, and that Mr. Kelley would pay me.

*Q.* In the fall of 1883, when there was some difficulty with regard to other matters, did you then go to Mr. Rhodes' office and see him and Kelley together?

*A.* Yes, sir; I saw them both together.

*Q.* State what Mr. Rhodes said.

*A.* Mr. Rhodes said that he was in no fear whatever of Mr. Kelley leaving the city; that I was perfectly safe in going his bail, or taking it up again; that I should never lose a cent, as he had business with him, or owed him, something of that kind he brought in—but I can't say exactly what it was, but that he would see that all was right, and that I should not lose a cent. So I took up the bail again. I asked him to do it, but he said he could not do it. He said for different reasons that he did not wish to take up the bail, and I took it up. Mr. Rhodes spoke frequently to me in reference to Mr. Kelley's services. He spoke of Mr. Kelley having worked for him. I was anxious to get my money, and I asked Mr. Rhodes frequently if there was any possibility of this matter being settled so that I could get my money, and he would always say: "Kelley is at work and we will get this thing settled. You will get your money; I will give him money and make him a free man."

These conversations took place with Mr. Rhodes in 1879 or 1880.

It will be observed that the amount of the indebtedness supposed to be established by this witness is not mentioned by her. It was stated, however, by plaintiff's counsel, that at the date of the conversation, there were numerous judgments against the claimant, amounting in round numbers to about $20,000; that the claimant was then worthless, and these judgments, therefore, could no doubt have been bought for $10,000. The decedent's assertion that he would make Mr. Kelley a free man could only be carried out by relieving him of these judgments; ergo, he promised to pay him $10,000.

The proposition, which does credit to the candor of the claimant in conceding that the judgments against him for $20,000 could be bought for $10,000, is ingenious but not convincing. The subject of the conversation with Mrs. Patton was the debt

of the claimant to her, a debt spoken of by the decedent as a "debt of honor," and the expression "make a free man of Mr. Kelley" may, not unnaturally, be understood as relating to that debt. Owning no property, the payment of his judgments could scarcely be regarded as a necessary step in securing his freedom. *Cantabit vacuus coram latrone viator*. A debt of honor may have been a heavy burden. Something more definite than this is required to rid a claim of the bar of the statute.

In Wambold v. Hoover, 16 W. N. C. 327, it was said: "The statute of limitations is regarded as a wise and beneficial law; and, therefore, whenever it is sought to be removed by proof of a new promise, such promise ought to be proved in a clear and explicit manner. It is not necessary that the promise should be express; it may be raised by implication from the acknowledgment of the party. If the expression be vague, equivocal, and indeterminate, leading to no certain conclusion, but at best to probable inferences, which may affect different minds in different ways, they ought not to go to the jury as evidence of a new promise."

It is true that the same strictness is not required where the existence of an indebtedness is recognized by the debtor before it has become barred by the statute; but in the present case there is no proof of the amount of the debt, or of facts from which the amount can be ascertained.

Dr. Ashton, who presented a claim in his own behalf which has already been considered, testified in support of the claim of Mr. Kelley as follows:

I know that Mr. Rhodes employed Mr. Kelley continuously, daily, for a number of months and years, probably from 1878 or 1879 up to 1883. I was engaged helping Mr. Rhodes in obtaining all the outstanding obligations against the Danville, Hazleton, & Wilkesbarre Railroad Company, and also in purchasing the outstanding securities for Mr. Rhodes, and for others acting with him, such as Mr. Eyre, the chairman of the committee; and I know that Mr. Kelley was continuously rendering him services in purchasing him securities at auction and raising money upon securities for the purpose of enabling him to carry out his agreement with the committee of bondholders. and also in selling for Mr. Rhodes securities, when he was in need of money, as well as borrowing for Mr. Rhodes upon se-

curities; and then, when the notes would mature, Mr. Kelley would sell them for him, he being a broker.  I frequently came in contact with Mr. Kelley.

*Q.* Do you know of his attending auction sales in that connection ?

*A.* Yes, sir; I have met him at Thomas & Sons, and was told by Mr. Rhodes that Mr. Kelley would represent him in certain sales or purchases of the securities of the Danville, Hazleton, & Wilkesbarre Railroad Company.  That was the principal work.  I know 'that he was also largely engaged in selling the bonds of the new road, the Sunbury, Hazleton, & Wilkesbarre Railroad Company, for Mr. Rhodes.  I obtained, myself, $4,000 of Mr. Rhodes' bonds or the ones that he held.  In my connection with Mr. Eyre, buying bonds for him, I was under contract with Mr. Eyre to buy all the old bonds of the Danville, Hazleton, & Wilkesbarre Railroad Company, that I could; and I distinctly recollect one lot of $4,000 I bought from Mr. Kelley.

*Q.* Did you have any conversation with Mr. Rhodes as to the compensation of Mr. Kelley independent of the Porter suit ?

*A.* In connection with the services I rendered, Mr. Rhodes frequently, in the neighborhood of 1880, 1881, and 1882, enumerating the difficulties he had, and the payments he had to make, said there was a large amount due Mr. Kelley for services which he was continually rendering him, and that without him he would be unable to do what he was doing.

*Q.* Did he say when payments were to be made to Mr. Kelley ?

*A.* He said positively that when he was through with his difficulties, and had paid off all matters and arranged all matters as with me, he would pay Mr. Kelley largely for his services. In a general way, that is what he said to me.  There were other specific matters he spoke of in connection with Mr. Kelley and others, some of which he had paid, which he gave as a reason and explanation of why he had not paid me.

*Q.* Do you know about the Porter suit ?

*A.* Yes, sir; I aided Mr. Rhodes in getting together the material.

*Q.* Who, in point of fact, defended that suit ?

*A.* Mr. Rhodes did all the work, in connection with his counsel.

*Q.* What did he say in regard to defending that suit ?

*A.* He said, in reference to that suit, that he had to bear the

laboring oar of that suit and other suits. He said that Mr. Kelley rendered essential services in preparing papers, collecting documents, and letters, and that he would have to pay Mr. Kelley a sum which at the time, as well as I could recollect, in connection with the suit of Mr. Rhodes, was $3,400. That was the sum which Mr. Rhodes told me that he would have to pay Mr. Kelley for his services, and that without him he could not have won the case. I recollect distinctly the sum of $3,400; and I have mentioned that frequently to others, between that time and this, to Mr. Dalmas, for instance, in talking about matters.

*Q.* Did you know from Mr. Rhodes anything in regard to the fact whether Mr. Kelley had been largely connected with the business of Mr. Porter, prior to the commencement of the suit, as having been a help to him?

*A.* I knew from Mr. Rhodes and from Mr. Porter himself, that Mr. Kelley helped Mr. Porter. I knew that from my connection with Mr. Rhodes, and that Mr. Kelley was thoroughly familiar with all the matters connected with these particular bonds that were in question, which had not been put in, in the ordinary way, for their dividend, and that Mr. Kelley had the control of them.

*Q.* Do you know whether Mr. Kelley afterwards purchased the bonds for Mr. Rhodes?

*A.* I do not know that Mr. Kelley purchased them. I know that Mr. Rhodes told me he had purchased them.

*Q.* Do you know at what figure Mr. Rhodes purchased those bonds from the executor of Mr. Porter, after the termination of this suit?

*A.* Mr. Rhodes asked me to endeavor to buy them, and I did make some efforts, through an agent named Sheppard, whose place of business, a brush establishment, was on Arch street, and who represented Mr. Porter's estate; but I failed, and I was subsequently told by Mr. Rhodes that he had bought them for $100, or some small sum. I think the first offer was $100.

There is nothing in this testimony to change what has already been said, except that part of it which alleges an admission, by the decedent, of an obligation to pay the claimant $3,400 for his services in the Porter suit, the statement of the witness that he had told Mr. Dalmas being contradicted by Mr. Dalmas

himself.    A claim by a layman for so large a sum as $3,400,
for services with regard to a law suit, is of such an extraordinary
character that it ought to be supported by evidence clearly show-
ing what the services were, and should not rest upon a loose
declaration of a decedent made to a stranger, especially where
the alleged debtor lived for several years after the services were
rendered, and the claim was not presented until "after his
death."    "Admissions," as was said by Judge COULTER, in
Harbold v. Kuntz, 16 Pa. 214, are "the easiest mode of testi-
mony to lead to error, the kind of evidence most apt to be mis-
apprehended and mistaken, and in relation to which a facile
conscience may stretch itself like India rubber."

This was said of a claim for services amounting to $1,400,
sought to be established by the admission of a dead man.    The
claim in the present case is for more than double that sum.

But the effect of all this testimony is entirely overcome by
the acts and declarations of the claimant himself.    On the 11th
of February, 1880, without pretending, so far as appears, that
he was a creditor, he borrowed from the decedent $50, and gave
his due bill therefor, which is still held by the accountants as
administrators.    On the 20th of March, 1883, about the date of
one of the conversations spoken of by Mrs. Patton, he wrote a
note to the decedent as follows:

March 20, 1883.

Dear Friend, Mr. Rhodes:

I have had much trouble in securing bail, but have at last
found a party who will do it for $125; please be kind enough
to give the bearer, Mr. Thompson, the money, and I will be out
this evening; by so doing, you will greatly oblige a greatly dis-
tressed friend.

H. B. Kelley.

There is here nothing like an assertion of claim, and the evi-
dence showed, moreover, that the decedent, so far from recob-
nizing the existence of obligation, refused to make the desired
advance.    But there is much more than this.    Captain Robert I.
Linden, superintendent of the Pinkerton Detective Agency, was
the officer by whom the claimant was arrested, on the charge of
issuing forged bonds at the time spoken of by Mrs. Patton, and
in the note just referred to, and he afterwards arrested him

September 11, 1883, under a bailpiece taken out by Mrs. Patton.

"He asked me," said this witness, "if I would go to Mr. Rhodes' office with him, which was next door to mine, and I said: 'Yes; that I did not mind it.' It was a disagreeable day. He said: 'I think Rhodes ought to go my bail.' I said: 'What reasons have you for thinking so?' He said: 'No particular reasons, except that I have had a good many transactions with him in the past, and I have done him favors.' Kelley asked Rhodes to go his bail, saying that his bail had been given up. Rhodes declined to do it, and said that he could not go on his bail. He said to him: 'You know I can't go on your bail.' There was nothing said in regard to the relations between them except this: Rhodes said: 'Kelley, I can't go your bail; I don't want to go your bail.' Kelley said: 'Well, now, you ought to get me out of this trouble. We have dealt together a long time.' Rhodes said: 'That is all very true; but Kelley, I can't do it.' Kelley then said: 'Will you go and see Mrs. Patton for me?' Rhodes said that he would do it, and he went away. I then took Kelley in my office. We remained there until Mr. Rhodes came back with Mrs. Patton, and I then went into Mr. Rhodes' office again. Rhodes then told Kelley that he had seen Mrs. Patton, and that she would go on his bail again. Mrs. Patton was a little uneasy about it, and I was asked when the trial would likely take place. I said that I expected it would be in about two weeks, and Rhodes said: 'I think we can trust him that long; I don't think Kelley will go away.' Then he said: 'If he does go away inside of ten days or two weeks, I will indemnify you for the bail bond.' "

Upon cross-examination Captain Linden stated what was said by the claimant somewhat more in detail: "When I told him that I had a bailpiece and had to arrest him, he said: 'Now, this is too bad. Where will I get bail? Will you go down to Rhodes' office with me? Rhodes ought to go my bail.' I said: 'What reasons have you for thinking so?' He said: 'No particular reason; he is under no obligation to me; but we had a great many transactions in the past, and I have done Rhodes a good many favors.'

*Q.* Did not Mr. Kelley tell you, at that time, that Mr. Rhodes

was under obligations to him; that he would do it or should do it?

A. No, sir; he said what I have stated. He mentioned 'obligations,' and he said he was under no obligation, but he had done many favors in the past."

The claim is disallowed.

Plaintiff's counsel asked that the cost of a citation, under which the account was filed, $2.75, should be allowed him. The right of his client to demand an account was dependent upon his claim as creditor; and that not having been sustained, costs cannot be allowed him.

The account was on the audit list for July, 1885, and was then called for audit; but it was stated that at least a week would be required for its disposal, and as that length of time could not be given before the rising of the court for the summer vacation, counsel were requested to come in on the first Monday of October, at the reopening of the court, and ask to have a day appointed. This was done; but as the October list was a very long one, occupying all of the time of the court that could be given to the auditing of accounts, the second Monday of November was fixed for hearing this estate, in order that the entire week might be devoted to it.

In the meanwhile Mr. Hirst had requested the auditing judge to take the somewhat unusual step of noting upon the list that he represented a creditor.

When the account was called on the second Monday of November, Mr. Hirst being present, but not stating the person for whom he appeared, the announcement was made by the auditing judge that if the hearing began, it would go on continuously until the case was disposed of, and that proceedings would not be suspended on account of absence of witnesses or any similar reason. No application for a postponement was made, but Messrs. Harrington and Murphy, on behalf of Mr. Kelley, exhibited a letter from J. R. Casselberry, whom they expected to examine as a witness, and who, as they supposed, would be present in order to present a claim of his own, stating that he had already attended on two former occasions, and it would not be convenient for him to come again until a later date; and it was asked by these gentlemen that they "might have the privilege of taking Mr. Casselberry's deposition, if they desired to do

so," which, as a matter of course, was granted. Proceedings were then begun; and Monday and Tuesday were spent in taking testimony and listening to the statements of the various counsel in the case.

On Wednesday Mr. Hirst, on behalf of J. R. Casselberry, and without urging any reason except the convenience of his client, who was out of the city, asked that the further consideration of the estate should be suspended until some future time. His application was refused. On the following day, Thursday, in the midst of the argument upon the claim of S. P. Kase, and just before the hour of adjournment, Mr. Hirst again appeared, and stated that a bill in equity was about to be filed in the court of common pleas, by Jacob R. Casselberry, to use, etc., against the accountant for the settlement of the account of a partnership alleged to exist between him and the decedent. For this reason it was again asked by Mr. Hirst that the distribution of the balance shown by the account should be suspended until the termination of the threatened litigation.

This application was made November 12, 1885, the decedent having died, as already stated, April 19, 1884. The children of a dead man have their rights as well as creditors. Under the circumstances which have been stated, it would, in the opinion of the auditing judge, be doing injustice to delay the settlement of this estate, at the instance of one who has failed to assert his claim for so long a period.

Whatever rights he may have will be fully protected by the refunding bonds to be given by the distributees.

Numerous exceptions to the account were presented on behalf of Mr. Kase, and concurred in by Mr. Kelley. The claims of these gentlemen, however, having been disallowed, their exceptions necessarily fall; and the account having been admitted to be correct by the only parties in interest, the balance shown thereby, $31,195, less clerk's fees, $18.50, etc., etc., will be distributed in kind among the children of the decedent, hereinbefore named, in equal shares.

And now, the said account having been called as aforesaid, and no exceptions thereto (other than as stated) having been filed or presented, it is ordered and adjudged that the same be confirmed ni..i, on payment of clerk's fees, and that distribution be made as above directed.

Mary J. Thompson, assignee of Holmes B. Kelley, filed exceptions to the adjudication.

These exceptions were dismissed by the court, with the following opinion by ASHMAN, J.:

. . . Without borrowing some aid from the language of metaphysics it will be difficult to put into intelligible shape the other claim against the estate. It was purely impalpable, and apparently arose from the claimant's belief that death worked such a change in the relations of the decedent as to render his estate liable for debts which he had himself paid in his lifetime. Its amount and the character and value of the services upon which it was founded were wholly *in nubibus;* and were left, probably, in order to avoid the possibility of an appeal hereafter to the imagination of the court.

Collections were shown to have been made by the claimant as agent for the decedent, but every circumstance in the case tended to prove that the commissions must have been deducted before the proceeds were turned over. Vague declarations of the decedent that the claimant had aided him, and that he intended to make him a free man, were also proved. These items exhausted what may be called the evidence, and there is no legal term for the matter which was offered beside. This related to nothing which had gone before and to nothing which followed, and can be labeled as testimony, only because it was given under oath. It comprised a list of interviews, industriously ascertained by counsel to have numbered 1686, which had taken place between the decedent and the claimant, whose scene was sometimes the office of the claimant and sometimes the street. But whether these interviews were prompted by business or affection, whether they related to this contract or to another, or to no contract at all, whether they dealt with this world or eternity, was not shown by the witness, and was scarcely hinted by the diary. The claim rested mainly upon the declaration of the decedent, that he intended to make a "free man" of the claimant; and counsel endeavors to buttress this ethereal basis with figures showing that judgments existed at that time against the plaintiff in the sum of $20,000.

The sum which would release him from those judgments was, therefore, assumed as the measure of his freedom, and by a parity of reasoning as the measure of his claim. The generosity

of the claimant, however, would not permit the latter result. He confessed that the judgments could have been bought up at one half of their face value, and he reduced this portion of his demand accordingly. For services in connection with a suit in which the decedent was engaged, the claimant asked an additional sum of $3,500. He was shown to have been a witness in that case, and declarations of the decedent to a third party were given at the audit, to the effect that the claimant had prepared papers and collected documents which had enabled him to win the suit, and that he would pay the claimant therefor $3,400. This testimony, which was given by a person whom several witnesses declared they would not believe upon oath, was neutralized by the acts of the claimant himself.

About the time when the promise of the decedent was alleged to have been made, and some years after the performance of the services in question, the claimant was arrested on a criminal charge. He wrote to the decedent asking for money with which to secure bail, and was refused. Six months afterward his bail surrendered him, and he urged the decedent to go upon his bond, and was again refused. When asked by the officer why he applied to the decedent, he replied that he had done the decedent favors in the past, but that the latter was under no obligation to him.

Both claims were properly rejected, and the exceptions to the adjudication are therefore dismissed.

The exceptant thereupon appealed, assigning as error the action of the court: (1) In finding that any portion of her claim was barred by the statute of limitations; (2) in disallowing her claim for $3,400, for services of H. B. Kelley, in the suit of Porter v. Kinsey; (3) in disallowing her claim for $10,000 for services of H. B. Kelley; (4) in not giving her sufficient time to procure the testimony of J. R. Casselberry; (5) in not giving her the benefit of testimony of J. R. Casselberry; and (6) in not allowing her claim.

*David C. Harrington* for appellant.

*Crawford & Dallas* and *Samuel Gustine Thompson* for appellees.

PER CURIAM:

We affirm the decree in this case for reasons given in the opinions of the learned judges of the court below.

Decree affirmed and appeal dismissed, at costs of appellant.